# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT MICHAEL PUGH,** | : | |
| **Individually and on Behalf of All** | : | |
| **Similarly Situated Mental Health Roster** | : | **No. 1:25-cv-00893** |
| **Inmates at SCI Rockview,** | : | |
| **Plaintiff** | : | **(Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | |
| **DR. LAUREL HARRY, <u>et al.</u>,** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Currently before the Court is pro se Plaintiff Robert Michael Pugh ("Pugh")'s complaint in which he raises claims against: (1) Josh Shapiro ("Shapiro"), the Governor of the Commonwealth Pennsylvania; (2) Dr. Laurel Harry ("Harry"), the Secretary of the Commonwealth of Pennsylvania Department of Corrections ("DOC"); and (3) a DOC Steering Committee ("Committee"). Pugh's claims arise out of a February 2025 announcement proposing to close Pennsylvania State Correctional Institution Rockview ("SCI Rockview"), where Pugh is incarcerated and treated for his mental health issues. Pugh seeks to proceed on behalf of other similarly situated SCI Rockview mental health roster inmates in this case.

Pugh has also filed an application for leave to proceed <u>in forma pauperis</u>, a motion for class certification, a motion for appointment of counsel, and a motion for leave to file an amended complaint by appointed class counsel. For the reasons set forth below, the Court will (1) grant Pugh leave to proceed <u>in forma pauperis</u>, (2) dismiss his complaint with leave to amend as to only certain claims, and (3) deny his other motions.

## I.    BACKGROUND

Pugh commenced this action by filing the following documents, all of which the Clerk of Court docketed on May 20, 2025: (1) a complaint (Doc. No. 1); (2) an application for leave to proceed in forma pauperis ("IFP Application") (Doc. No. 2); (3) an uncertified prison trust fund account statement (Doc. No. 3); (4) a motion for class certification (Doc. No. 5); (5) a motion to appoint class counsel (Doc. No. 6); and (6) a motion for leave to file an amended complaint upon the appointment of class counsel (Doc. No. 7). Because Pugh's account statement was not certified in accordance with 28 U.S.C. § 1915(a)(2),[1] an Administrative Order issued requiring the submission of Pugh's certified account statement. (Doc. No. 8.) Pugh's certified account statement was docketed with the Clerk of Court on June 4, 2025. (Doc. No. 10.)

In his complaint, Pugh names Harry, Shapiro, and the Committee as Defendants. (Doc. No. 1 at 1–3.)[2] He asserts claims against Harry and the Committee in their individual and official capacities as well as against Shapiro in his official capacity. (Id. at 7.) In addition, Pugh purports to assert these claims "individually and on behalf of all similarly situated Mental Health Roster Inmates housed at [SCI Rockview]. See (id.).

_____

[1] Section 1915(a)(2) states as follows:

> A prisoner seeking to bring a civil action . . . without prepayment of fees or security therefor, in addition to filing the affidavit filed under paragraph (1), shall submit a certified copy of the trust fund account statement (or institutional equivalent) for the prisoner for the 6-month period immediately preceding the filing of the complaint . . . obtained from the appropriate official of each prison at which the prisoner is or was confined.

See 28 U.S.C. § 1915(a)(2).

[2] Pugh avers that he does not know the names of the members of the Committee. (Id. ¶ 7.)

Pugh alleges that on February 10, 2025, Harry and the Committee publicly announced plans to close SCI Rockview, a designated mental health facility.  (Id. ¶ 9.)  This closure "was said to be a part of . . . Shapiro's budgetary decisions," as the repair and renovation costs to SCI Rockview totaled $74 million.  See (id. ¶¶ 9–10).  Shapiro allegedly deferred to Harry about the proposed closure and publicly supported it "despite Harry's determination being made before the 90 day [sic] feedback period required under Act 133 of 2018."  See (id. ¶¶ 42, 43).

Prior to this announcement, neither the SCI Rockview inmates nor the SCI Rockview staff were aware of the possible closure of SCI Rockview.  (Id. ¶ 11.)  In response to learning about the closure, SCI Rockview staff "expressed immense shock," and Pugh "experienced generalized anxiety and uncertainty."  See (id. ¶¶ 12–13).  SCI Rockview staff told Pugh and other inmates the following: (1) unlike SCI Rockview, the other DOC facilities "were significantly hostile and dangerous facilities" and "had high rates of assault, extortion, and rape," see (id. ¶¶ 14, 17); (2) the other DOC facilities "did not offer the same Mental Health Programming as SCI Rockview," see (id. ¶ 16); (3) the "purported needed repairs totaling [$74 million] had either been completed or [were] under contract to begin," see (id. ¶ 18); and (4) they "were frustrated that they were not given advanced notice of the proposed closure for the purpose[] of assisting inmates, including [him]."  See (id. ¶ 19).  Staff also told Pugh that his "current mental health classification would not be honored due to forecasted overcrowding should SCI Rockview close."  See (id. ¶ 16).

Several hours after the closure announcement, SCI Rockview's Superintendent issued a memorandum to all inmates, including Pugh, which informed them that the Committee selected SCI Rockview for "proposed closure."  See (id. ¶¶ 20, 21).  This memorandum "outlined a process under Act 133 of 2018 that was said to already have begun."  See (id. ¶ 22).  It also

"acknowledged that inmates, including [Pugh], may be feeling anxious or concerned," and directed those inmates feeling anxious or concerned to "Supportive Services staff," which included psychologists, unit teams, chaplaincy, and peer specialists.  See (id. ¶¶ 23, 24).

On February 11, 2025, Pugh and other similarly situated inmates visited their unit teams and psychologists who were part of the "Supportive Services staff."  See (id. ¶ 25).  The psychology staff told Pugh and the other inmates that they lacked information about the proposed closure "due to a lack of transparency and communication from . . . Defendants."  See (id. ¶ 26). Supportive Services staff admitted to Pugh and the other similarly situated inmates that "they have been excluded from essential communication and planning," rendering them "helpless." See (id. ¶ 31).  Additionally, SCI Rockview staff suggested to Pugh and other inmates to provide feedback to Defendants about the proposed closure.  (Id. ¶ 27.)  Pugh and the other inmates were also encouraged to write senators, representatives, county commissioners, and Shapiro about the proposed closure.  (Id.)

In response to these suggestions, Pugh and other inmates wrote a joint letter to "those they had addresses for," as well as individual letters, in which they indicated that SCI Rockview has "unique Mental Health Programs that other [DOC] facilities [do not]."  See (id. ¶ 29).  Pugh and the other inmates also stated in their joint letter that "Supportive Services were nonexistent due to a lack of transparency and communication."  See (id. ¶ 30).  Pugh and other inmates further "submitted identical grievances complaining of mental and emotional injury which were later denied."  See (id. ¶ 32).

Pugh avers that anonymous SCI Rockview staff "openly expressed [in news articles] that . . . Defendants had not considered the impact [of the proposed closure] on key stakeholders, including inmates and [him]."  See (id. ¶ 33).  After these "reports," Pugh, who was known by

4

Defendants to be "particularly vulnerable of being harmed" and "engaged in self-mutilation by cutting." See (id. ¶ 34). Also, another inmate attempted suicide, while yet another inmate committed suicide. See (id.). Other inmates "sought emergency psychiatric treatment" including increased medication and psychiatric observation, and others "abandoned their treatment and engaged in homocidal [sic] behavior." See (id. ¶¶ 35, 38).

Following these events, SCI Rockview's Administration issued pamphlets about suicide prevention and "staff recorded an institutional video on the importance of resilience." See (id. ¶ 36). Pugh avers that "[t]hese event[s] further demonstrate[d] the mishandling[, as well as] lack of communication and planning due to . . . Defendants [sic] lack of transparency to key essential staff." See (id. ¶ 37). He also alleges that he was "denied safety, protection[,] and access to meaningful Supportive Services" and suffered "severe physical and mental health damages." See (id. ¶¶ 39, 40).

Pugh claims that Harry "established and maintained deficient policies and procedures relating to the proposed closure and the safety and wellbeing of the most affected, most vulnerable population, including [him]." See (id. ¶ 44). The lack of planning and guidance by the Committee and Harry caused Pugh's safety and wellbeing to go unmonitored. (Id. ¶ 45.)

Based on these allegations, Pugh claims that: (1) Defendants were deliberately indifferent to his serious medical needs and failed to protect him in violation of the Eighth Amendment to the United States Constitution; (2) Harry is liable for violating the Fourteenth Amendment for "supervisor [sic] liability"; (3) Defendants violated the "Federal Disability Statutes"; and (4) Defendants conspired to violate his constitutional rights. See (id. at 11–14). For relief, Pugh seeks, inter alia: (1) compensatory damages; (2) punitive damages; and (3) an injunction preventing the closure of SCI Rockview. (Id. at 15.)

## II.    LEGAL STANDARDS

### A.    Applications for Leave to Proceed in Forma Pauperis

Under 28 U.S.C. § 1915(a)(1), the Court may allow a plaintiff to commence a civil case

"without prepayment of fees or security therefor," if the plaintiff "submits an affidavit that

includes a statement of all assets such prisoner possesses that the person is unable to pay such

fees or give security therefor."[3]  See id.  This statute

> "is designed to ensure that indigent litigants have meaningful access to the federal
> courts."  Neitzke v. Williams, 490 U.S. 319, 324, 109 S.Ct. 1827, 104 L.Ed.2d 338
> (1989).  Specifically, Congress enacted the statute to ensure that administrative
> court costs and filing fees, both of which must be paid by everyone else who files
> a lawsuit, would not prevent indigent persons from pursuing meaningful litigation.
> [Deutsch v. United States, 67 F.3d 1080, 1084 (3d Cir. 1995)].  Toward this end, §
> 1915(a) allows a litigant to commence a civil or criminal action in federal court in
> forma pauperis by filing in good faith an affidavit stating, among other things, that
> [they are] unable to pay the costs of the lawsuit.  Neitzke, 490 U.S. at 324, 109 S.Ct.
> 1827.

See Douris, 293 F. App'x at 131–32 (footnote omitted).

A litigant can show that they are unable to pay the costs of the lawsuit "based on a

showing of indigence."  See Deutsch, 67 F.3d at 1084 n.5.  The Third Circuit Court of Appeals

has not defined what it means to be indigent; nevertheless, "[a] plaintiff need not 'be absolutely

destitute to enjoy the benefit of the statute.'"  See Mauro v. N.J. Supreme Ct. Case No. 56,900,

238 F. App'x 791, 793 (3d Cir. 2007) (unpublished) (quoting Adkins v. E.I. DuPont de Nemours

& Co., 335 U.S. 331, 339 (1948)).  Some district courts have explained that all a litigant needs to

show is that because of their poverty, they cannot afford to pay for the costs of the litigation and

---

[3]  While the Court recognizes that Pugh is incarcerated, "[t]he reference to prisoners in §
1915(a)(1) appears to be a mistake.  In forma pauperis status is afforded to all indigent persons,
not just prisoners."  See Douris v. Middletown Twp., 293 F. App'x 130, 132 n.1 (3d Cir. 2008)
(unpublished).

provide themselves with the necessities of life.  See, e.g., Rewolinski v. Morgan, 896 F. Supp. 879, 880 (E.D. Wis. 1995) ("An affidavit demonstrating that the petitioner cannot, because of his poverty, provide himself and any dependents with the necessities of life is sufficient."); Jones v. State, 893 F. Supp. 643, 646 (E.D. Tex. 1995) ("An affidavit to proceed in forma pauperis is sufficient if it states that one cannot, because of poverty, afford to pay for the costs of litigation and still provide for him- or herself and any dependents.").

### B.    The Court's Screening of Complaints Under 28 U.S.C. §§ 1915A and 1915(e)(2)

Under 28 U.S.C. § 1915A, this Court must "review . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity."  See 28 U.S.C. § 1915A(a).  If a complaint is frivolous or fails to state a claim upon which relief may be granted, the Court must dismiss the complaint.  See id. § 1915A(b)(1).  The Court has a similar screening obligation with respect to actions filed by prisoners proceeding in forma pauperis.  See id. § 1915(e)(2)(B)(ii) ("[T]he [C]ourt shall dismiss the case at any time if the [C]ourt determines that . . . the action or appeal . . . is frivolous . . . [or] fails to state a claim on which relief may be granted . . . .").

A complaint is frivolous under Sections 1915A(b)(1) and 1915(e)(2)(B)(i) if it "lacks an arguable basis either in law or fact."  See Neitzke, 490 U.S. at 325.  In addition, when reviewing whether a plaintiff has failed to state a claim upon which relief may be granted under Sections 1915A(b) or 1915(e)(2), the Court applies the standard governing motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See, e.g., Smithson v. Koons, No. 15-cv-01757, 2017 WL 3016165, at *3 (M.D. Pa. June 26, 2017) ("The legal standard for dismissing a complaint for failure to state a claim under § 1915A(b)(1) [and] § 1915(e)(2)(B)(ii) . . . is the same as that for dismissing a complaint pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure."), report and recommendation adopted, 2017 WL 3008559 (M.D. Pa. July 14, 2017); Mitchell v. Dodrill, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010) (explaining that when reviewing a complaint for possible dismissal pursuant to § 1915A, "a court employs the motion to dismiss standard set forth under Federal Rule of Civil Procedure 12(b)(6)").  To avoid dismissal under Rule 12(b)(6), a plaintiff must set out "sufficient factual matter" in the complaint to show that their claims are facially plausible.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).  When evaluating the plausibility of a complaint, the Court accepts as true all factual allegations and all reasonable inferences that can be drawn from those allegations, viewed in the light most favorable to the plaintiff.  See id.; In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  However, the Court must not accept legal conclusions as true, and "a formulaic recitation of the elements of a cause of action" will not survive a district court's screening of a complaint under Sections 1915A and 1915(e)(2).  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007).

In addition, in the specific context of pro se prisoner litigation, the Court must be mindful that a document filed pro se is "to be liberally construed."  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Higgs v. Att'y Gen., 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a pro se litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)).  Therefore, a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by

lawyers."  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting Estelle, 429 U.S. at 106).  This means the court must "remain flexible, especially 'when dealing with imprisoned pro se litigants . . . .'"  See Vogt v. Wetzel, 8 F.4th 182, 185 (3d Cir. 2021) (quoting Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244–45 (3d Cir. 2013))).

Additionally, when construing a pro se complaint, the court will "apply the relevant legal principle even when the complaint has failed to name it."  See Mala, 704 F.3d at 244.  However, pro se litigants "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'"  See Vogt, 8 F.4th at 185 (quoting Mala, 704 F.3d at 245).

C.     Section 1983

Section 1983 is the statutory vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983. This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id.  "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors."  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002)).  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

### III.    DISCUSSION

#### A.    The IFP Application

After reviewing the IFP Application and Pugh's certified prisoner trust fund account statement, it appears that he is unable to pre-pay the costs of this civil action.  Therefore, the Court will grant the IFP Application and allow Pugh to proceed in forma pauperis in this case.[4]

#### B.    Screening of the Complaint and Review of Pugh's Other Motions

##### 1.    Pugh's Class-Related Claims and Motion for Class Certification

In his complaint, Pugh purports to bring his claims on "behalf of all similarly situated Mental Health Roster Inmates at SCI Rockview."  See (Doc. No. 1 at 7).  He has also filed a motion for class certification.  (Doc. No. 5.)  The Court will dismiss Pugh's class-related claims from the complaint and deny his motion for class certification because, as a pro se litigant, Pugh may not proceed in this case on behalf of others or a putative class.  See Murray v. City of Phila., 901 F.3d 169, 170 (3d Cir. 2018) ("Although an individual may represent himself or herself pro se, a non-attorney may not represent other parties in federal court." (citation omitted)).  Instead, Pugh may only plead and conduct his own case personally or by counsel in this Court.  See 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."); Murray, 901 F.3d at 170 ("Section 1654 . . . ensures that a person may conduct his or her own case pro se or retain counsel to do so."); Osei-Afriyie v. Med. Coll. of Pa., 937 F.2d 876, 882 (3d Cir. 1991) ("The statutory right to proceed pro se reflects a

---

[4]  However, because Pugh is a prisoner, he is advised that he will be obligated to pay the filing fees for this case in installments in accordance with the Prison Litigation Reform Act ("PLRA"), regardless of the outcome.  See 28 U.S.C. § 1915(b).

respect for the choice of an individual citizen to plead his or her own cause." (quoting <u>Cheung v.</u> <u>Youth Orchestra Found. of Buffalo, Inc.</u>, 906 F.2d 59, 61 (2d Cir. 1990))).  This principle also precludes non-attorney litigants from representing others through a class action.  <u>See</u> <u>Hagan v.</u> <u>Rogers</u>, 570 F.3d 146, 158–59 (3d Cir. 2009) (explaining that "<u>pro se</u> litigants are generally not appropriate as class representatives"); <u>Lewis v. City of Trenton Police Dep't</u>, 175 F. App'x 552, 554 (3d Cir. 2006) (unpublished) ("Lewis, who is proceeding <u>pro se</u>, may not represent a putative class of prisoners." (citing <u>Fymbo v. State Farm Fire & Cas. Co.</u>, 213 F.3d 1320, 1321 (10th Cir. 2000) and <u>Oxendine v. Williams</u>, 509 F.2d 1405, 1407 (4th Cir. 1975))).  Therefore, Pugh's attempt to raise claims on behalf of other SCI Rockview inmates and request for class action status are improper, and the Court will dismiss any claims brought on behalf of other inmates from the complaint and deny Pugh's motion for class certification.

### 2.    Pugh's Section 1983 Official-Capacity Claims for Monetary Damages Against Harry and Shapiro

Pugh asserts official- and individual-capacity Section 1983 claims against Harry, as well as Section 1983 official capacity claims against Shapiro.  (Doc. No. 1 at 6, 7, 11–13.)  Pugh also indicates that he seeks monetary damages as a form of relief.  (Doc. No. 1 at 5, 15.)  To the extent that Pugh seeks monetary damages under Section 1983 against Harry and Shapiro in their official capacities, the Eleventh Amendment of the United States Constitution bars these claims.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  <u>See</u> U.S. Const. amend. XI.  This Amendment

> has been interpreted to render states—and, by extension, state agencies and departments and officials when the state is the real party in interest—generally immune from suit by private parties in federal court.  Indeed, it has been recognized

> for over two hundred years that a state's immunity from suit in federal court is a fundamental principle of our constitutional structure that preserves, as intended by the Framers, the respect and dignity of the states and protects the ability of the states "to govern in accordance with the will of their citizens."

See Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 323 (3d Cir. 2002) (quoting

Alden v. Maine, 527 U.S. 706, 751 (1999)).

Eleventh Amendment immunity extends to all state agencies, departments, and entities

"having no existence apart from the state."  See Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir.

1981) (citation omitted).  As such, the DOC, as an agency of the Commonwealth of

Pennsylvania, is entitled to the Commonwealth's Eleventh Amendment immunity.  See 71 P.S. §

61(a) ("The executive and administrative work of this Commonwealth shall be performed by the

. . . Department of Corrections . . . .");  Downey v. Pa. Dep't of Corr., 968 F.3d 299, 310 (3d Cir.

2020) (explaining that "state sovereign immunity prohibit[ed]" plaintiff's Section 1983 claims

against the DOC).

The Eleventh Amendment also bars claims for monetary relief against state officials

acting in their official capacities because such claims are essentially claims against the

employing government agency.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)

("[A] suit against a state official in his or her official capacity is not a suit against the official but

rather is a suit against the official's office. As such, it is no different from a suit against the State

itself.");  A.W. v. Jersey City Pub. Schs., 341 F.3d 234, 238 (3d Cir. 2003) (explaining that

Eleventh Amendment immunity "extends to state agencies as well as state officials sued in their

official capacities for monetary damages").  Therefore, the Eleventh Amendment bars Pugh's

Section 1983 official-capacity claims for monetary damages against Shapiro and Harry because

such claims are essentially claims against the Commonwealth of Pennsylvania and the DOC,

respectively.

The Court recognizes that "Eleventh Amendment immunity is, however, subject to three primary exceptions: (1) congressional abrogation, (2) waiver by the state, and (3) suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law."  See Pa. Fed'n of Sportsmen's Clubs, 297 F.3d at 323 (citation omitted).  As for the first exception to Eleventh Amendment immunity, Congress did not intend to abrogate Eleventh Amendment immunity by enacting Section 1983.  See Quern v. Jordan, 440 U.S. 332, 344–45 (1979) (stating that "§ 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States").  Concerning the second exception, the Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity from suit in federal courts.  See 42 Pa. C.S. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); see also Lavia v. Pa., Dep't of Corr., 224 F.3d 190, 195 (3d Cir. 2000) (explaining that Pennsylvania has not waived its Eleventh Amendment immunity).  As for the final exception, even though Pugh also seeks injunctive relief against Harry and Shapiro, it does not affect whether his Section 1983 official-capacity claims for damages against them are viable.  Accordingly, the Court will dismiss Pugh's Section 1983 official-capacity claims for monetary damages against Shapiro and Harry because they are barred by the Eleventh Amendment.[5]

_____

[5]  Even if the Eleventh Amendment did not apply here, Pugh's official-capacity claims for monetary damages against Shapiro and Harry are implausible because "officials acting in their official capacities" are not "persons" subject to liability under Section 1983.  See Will, 491 U.S. at 71.  However, "state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983.  The Eleventh Amendment does not bar such suits, nor are state officers

### 3.    Pugh's Section 1983 Claims Against the Committee

Pugh asserts Section 1983 claims against the Committee in its individual and official capacities.  (Doc. No. 1 at 7.)  To the extent that the Committee is not protected by Eleventh Amendment immunity,[6] it is not considered a "person" for purposes of Section 1983 and, therefore, is not amenable to suit under Section 1983.  See 42 U.S.C. § 1983 (indicating that it applies only to "persons" acting under color of law who violate Constitution); Brown v. Wexford Health Sources, Inc., No. 16-cv-01680, 2018 WL 3156856, at *4 (W.D. Pa. June 28, 2018) ("The 'PA DOC Hepatitis C Treatment Committee' is not a 'person' for purposes of a § 1983 claim."); Heim v. Moore, No. 11-cv-00270, 2012 WL 1118636, at *4 (M.D. Pa. Apr. 3, 2012) ("The [DOC's Religious Accommodation Review Committee] is not a cognizable defendant for the purposes of [plaintiff's] § 1983 claim, as it is not a 'person' for the purposes of [Section 1983]." (citation omitted)); Green v. Dep't of Corr., No. 05-cv-02446, 2007 WL 9702669, at *9 (M.D. Pa. Feb. 23, 2007) ("[T]he plaintiff has no viable claim against . . . [the] PRC Committee because [it is] not [a] person[] within the meaning of § 1983."), report and recommendation adopted, 2007 WL 9702964 (M.D. Pa. Mar. 20, 2007); see also Fishburne v. SC Dep't of Corr., No. 23-cv-05469, 2025 WL 581890, at *8 (D.S.C. Jan. 17, 2025) (dismissing plaintiff's Section 1983 claim against "Central Classification," which plaintiff described as a committee, because it is not a "'person[]' within the meaning of § 1983"), report and recommendation adopted, 2025 WL 579990 (D.S.C. Feb. 21, 2025); Porter v. McCurdy, No. 22-cv-00023, 2022 WL 4001017, at

---

absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts."  See Hafer v. Melo, 502 U.S. 21, 31 (1991).

[6]  The allegations in the complaint do not sufficiently describe the nature of the Committee, other than that it recommended the closure of SCI Rockview.  As such, the Court cannot determine whether the Eleventh Amendment would bar any Section 1983 claims against it.

*2 (W.D. Okla. June 13, 2022) ("It is well established that committees within state entities or agencies are considered subdivisions of the same and are therefore, not suable entities under [Section 1983]." (citations omitted)), <u>report and recommendation adopted sub nom.</u>, <u>Johnson v. McCurdy</u>, 2022 WL 3995480 (W.D. Okla. Aug. 31, 2022).  Accordingly, the Court will dismiss Pugh's Section 1983 claims against the Committee.[7]

> ### 4.    Pugh's Request for an Injunction Preventing the Closure of SCI Rockview

Pugh "seeks injunctive relief from this Court preventing the closure of SCI Rockview which is being managed in a fashion that violates his constitutional rights."  <u>See</u> (<u>id.</u> ¶ 106). Pugh may not obtain such injunctive relief because the issue regarding the closure of SCI Rockview is not ripe for review.[8]

Article III of the United States Constitution limits federal courts to hearing claims where a live case or controversy exists.  <u>See</u> <u>Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.</u>, 554 U.S. 269, 273 (2008) ("Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'"); <u>Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.</u>, 80 F.4th 215, 217 (3d Cir. 2023) ("The Constitution limits [federal courts'] jurisdiction to disputes that have ripened fully.").  "'Ripeness is a separate doctrine from standing, but both doctrines originate from the same Article III requirement of a case or controversy,' as 'both turn on whether the threat of future harm . . . is sufficiently immediate to constitute a cognizable

---

[7]  To the extent Pugh's reference to suing the Committee in its individual capacity, <u>see</u> (Doc. No. 1 at 7), qualifies as demonstrating his intent to assert claims against the unidentified members of the Committee in their individual capacities, the Court analyzes these claims below.

[8]  "[C]onsiderations of ripeness are sufficiently important that . . . courts [are] required to raise the issue <u>sua sponte</u> . . . ."  <u>Peachlum v. City of York</u>, 333 F.3d 429, 433 (3d Cir. 2003) (citing <u>Felmeister v. Off. of Att'y Ethics, a Div. of the N.J. Admin. Off. of the Cts.</u>, 856 F.2d 529, 535 (3d Cir. 1988)).

injury.'" <u>Light v. Davis</u>, No. 23-2785, 2024 WL 4144066, at *2 (3d Cir. Sept. 11, 2024) (unpublished) (quoting <u>Free Speech Coal., Inc. v. Att'y Gen.</u>, 825 F.3d 149, 167 n.15 (3d Cir. 2016)). "The function of the ripeness doctrine is to determine whether a party has brought an action prematurely, and counsels abstention until such time as a dispute is sufficiently concrete . . . ." <u>Peachlum</u>, 333 F.3d at 433 (internal citation omitted).

"Various concerns underpin [the ripeness doctrine], including . . . whether a party is genuinely aggrieved." <u>Plains All Am. Pipeline L.P. v. Cook</u>, 866 F.3d 534, 539 (3d Cir. 2017); <u>see also</u> <u>Peachlum</u>, 333 F.3d at 433–34 (explaining that "considerations underpin[ning] the ripeness doctrine" include: (1) "are the parties in a sufficiently adversarial posture to be able to present their positions vigorously"; (2) "are the facts of the case sufficiently developed to provide the court with enough information on which to decide the matter conclusively"; and (3) "is a party genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one" (citation omitted)). Thus, when deciding whether a matter is ripe, the Court must examine: (1) "the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." <u>See</u> <u>Abbott Lab'ys v. Gardner</u>, 387 U.S. 136, 149 (1967), <u>abrogated on other grounds by</u> <u>Califano v. Sanders</u>, 430 U.S. 99 (1977).

"When making a 'fitness for review' determination, a court considers whether the issues presented are purely legal, and the degree to which the challenged action is final." <u>Comite' De Apoyo A Los Trabajadores Agricolas v. Perez</u>, 774 F.3d 173, 183 (3d Cir. 2014). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." <u>Texas v. United States</u>, 523 U.S. 296, 300 (1998) (internal quotation marks omitted). Stated differently, "for a case to be justiciable, the salient facts must be real, not hypothetical." <u>See</u> <u>Riehl v. Travelers Ins. Co.</u>, 772 F.2d 19, 22 (3d Cir. 1985).

Therefore, "the essential facts establishing a right to relief . . . [must] have already occurred." See id. The second prong, hardship to the parties, focuses on "whether the challenged action creates a direct and immediate dilemma for the parties, such that the lack of pre-enforcement review will put the plaintiffs to costly choices." See Phila. Fed'n of Tchrs. v. Ridge, 150 F.3d 319, 323 (3d Cir. 1998) (internal quotation marks omitted).

In this case, Pugh's concerns relating to the proposed closure of SCI Rockview including, inter alia, (1) the increased dangerousness of other DOC facilities, (2) whether those facilities have similar mental health programming as SCI Rockview, and (3) whether those other facilities would honor Pugh's current mental health classification, see (Doc. No. 1 at 8), are not ripe yet because a final decision as to its closure has not yet been made and he does not allege that it has. Pugh's claim relating to SCI Rockview's closure relies upon "contingent future events that may not occur as anticipated, or indeed may not occur at all," see Texas, 523 U.S. at 300, namely its actual closure. Therefore, any claim relating to SCI Rockview's actual closure is premature and unripe for this Court's review. See id.

### 5. Section 1983 Individual-Capacity Claims Against Harry and Members of the Committee

Pugh asserts Section 1983 claims against Harry and the Committee members for deliberate indifference to his serious medical needs and failure to protect in violation of the Eighth Amendment.[9] (Doc. No. 1 at 11–13.) The Court will first discuss the law applicable to these substantive claims, as well as the law applicable to determining whether a supervisory

---

[9] Although Pugh references the Fourteenth Amendment in his complaint (Doc. No. 1 at 12), his substantive claims for deliberate indifference to his serious medical needs and failure to protect fall under the Eighth Amendment.

official can be held liable under Section 1983, before analyzing whether Pugh has stated a

plausible Section 1983 Eighth Amendment claim against these Defendants.[10]

a.      **Applicable Law**

i.      **Deliberate Indifference to Serious Medical Needs**

The Eighth Amendment to the United States Constitution "prohibits prison officials from

being deliberately indifferent to an inmate's serious medical needs."  See Palakovic v. Wetzel,

854 F.3d 209, 227 (3d Cir. 2017) (citing Estelle, 429 U.S. at 104).  "To act with deliberate

indifference to serious medical needs is to recklessly disregard a substantial risk of serious

harm."  Id. (quoting Giles v. Kearney, 571 F.3d 318, 330 (3d Cir. 2009)).  In other words, a

prison official acts with deliberate indifference to an inmate's serious medical needs when the

official "knows of and disregards an excessive risk to inmate health or safety; the official must

both be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference."  See Farmer v. Brennan, 511 U.S. 825, 837

(1994).  Allegations of medical malpractice and mere disagreement regarding proper medical

treatment are insufficient to establish a constitutional violation.  See Spruill v. Gillis, 372 F.3d

218, 235 (3d Cir. 2004).  Additionally, if a prisoner is under the care of medical experts, a non-

medical prison official will generally be justified in believing that the prisoner is in capable

hands.  See id. at 236 (citation omitted)).

---

[10]  Based on the Court's prior analysis, only Pugh's Section 1983 individual-capacity claims for
monetary damages against Harry and the Committee members are still at issue.  Pugh asserted
only an official-capacity claim against Shapiro and, as discussed above, his request for injunctive
relief is unripe, and the Eleventh Amendment bars him from seeking damages against Shapiro in
his official capacity.

### ii.    Failure to Prevent Suicide or Self-Harm

The standard applicable to deliberate indifference claims against prison officials relating to failure to prevent suicide or self-harm are as follows:

> When a plaintiff seeks to hold a prison official liable for failing to prevent a [prisoner's] suicide [or self-harm] . . . a plaintiff must show: (1) that the individual had a particular vulnerability to suicide [or self-harm], meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide [or self-harm] would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

See id. at 223–24 (citation omitted).

As to the first element—the prisoner's particular vulnerability to suicide or self-harm—a plaintiff must plead facts informing the Court of "the degree of risk inherent in the [prisoner's] condition."  See id. at 222.  More specifically, "there must be 'a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'"  See Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024 (3d Cir. 1991) (citations omitted).  "[A] [prisoner's] strong likelihood of suicide [or self-harm] must be so obvious that a lay person would easily recognize the necessity for preventative action."  Palakovic, 854 F.3d at 222 (internal quotations omitted).

The second element, i.e., requiring the claimant to plead that the custodial officer knew or should have known of the prisoner's vulnerability to suicide, combines with the third element, requiring prison officials to have acted with reckless or deliberate indifference to a prisoner's particular vulnerability to suicide, to create "a relatively high level of culpability on the part of prison officials before holding them accountable."  See id. (citing Colburn, 946 F.2d at 1024–25).  Such a high culpability means that officials should act with "something beyond mere negligence."  See id.

### iii.    Section 1983 Supervisory Liability

In general, "a defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Additionally, to the extent that Pugh attempts to hold Harry liable simply because she is the Secretary of the DOC, he cannot do so because liability under Section 1983 cannot be predicated on respondeat superior.  See Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 227 (3d Cir. 2015) ("[Plaintiff] cannot predicate liability on her § 1983 claims on a respondeat superior basis." (citing Rode, 845 F.2d at 1207) (emphasis omitted)); Robinson v. Delbalso, No. 22-2378, 2022 WL 17248100, at *2 (3d Cir. Nov. 28, 2022) (unpublished) ("We agree with the District Court that Robinson's second amended complaint did not state a plausible claim for relief.  First, he failed to allege the defendants' personal involvement, and he cannot predicate liability on his § 1983 claims on a respondeat superior basis." (internal citations omitted)).  Instead, if Pugh is seeking to hold Harry liable for unconstitutional acts by her subordinates, Pugh's allegations must satisfy one of two theories of supervisory liability: first, "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" and second, "a supervisor may be personally liable under § 1983 if [they] participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in [their] subordinates' violations."  See A.M. ex rel. J.M.K. v. Luzerne County Juv. Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014) (explaining requirements for supervisory liability in section 1983 claim and describing "two

general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken

by subordinates"), rev'd on other grounds sub nom., Taylor v. Barkes, 575 U.S. 822 (2015).

To allege a plausible claim for supervisory liability under the first theory—the policy-

and-practice strand of supervisory liability—a plaintiff such as Pugh must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed
> to employ, and show that (2) the existing custom and practice without the identified,
> absent custom or procedure created an unreasonable risk of the ultimate injury, (3)
> the supervisor was aware that this unreasonable risk existed, (4) the supervisor was
> indifferent to the risk; and (5) the underling's violation resulted from the
> supervisor's failure to employ that supervisory practice or procedure. Put another
> way, the inmate must identify the supervisor's specific acts or omissions
> demonstrating the supervisor's deliberate indifference to the inmate's risk of injury
> and must establish a link between the supervisor, the act, and the injury.

See Chavarriaga, 806 F.3d at 227 (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d

Cir. 2001)).  For the second theory of supervisory liability—participating in, directing others to,

or knowledge and acquiescence of constitutional violation—generalized allegations that a

supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient

to allege personal involvement in an underlying constitutional violation.  See Saisi v. Murray,

822 F. App'x 47, 48 (3d Cir. 2020) (unpublished) ("Saisi asserted that some defendants were in

charge of agencies that allowed this to happen, and that liability stemmed merely from

defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held

liable 'simply because of [their] position as the head of the [agency].'" (quoting Evancho v.

Fisher, 423 F.3d 347, 354 (3d Cir. 2005))); Zigler v. Warren, No. 21-cv-19474, 2022 WL

903383, at *2 (D.N.J. Mar. 28, 2022) ("In simpler terms, a supervisor is not liable for the

unconstitutional conduct of his employees solely because he is a supervisor.").  Additionally,

"[a]lthough a court can infer that a defendant had contemporaneous knowledge of wrongful

conduct from the circumstances surrounding a case, the knowledge must be actual, not

constructive." See Chavarriaga, 806 F.3d at 222 (citing Baker v. Monroe Twp., 50 F.3d 1186, 1194 (3d Cir. 1995) and Rode, 845 F.2d at 1201 n.6).

### b.    Analysis

### i.    Claims Against Harry

In this case, Pugh's allegations in the complaint do not state a plausible supervisory liability claim against Harry under either of the two theories described above.  Concerning the second theory, Pugh does not allege any facts showing how Harry personally participated in violating his Eighth Amendment rights.  He does not allege that Harry is a medical provider who did not treat him, nor could he, because Harry, as Secretary of the DOC, is a non-medical prison official that is not responsible for directly rendering medical care to Pugh.  Moreover, as a non-medical prison official, Harry could not have been deliberately indifferent even if she knew that Pugh was complaining about the emotional impact of the proposed closure upon him because Pugh acknowledges that he had access to, and was being treated by, SCI Rockview's "Supportive Services staff," which included psychologists.  See (Doc. No. 1 ¶ 25); see also Spruill, 372 F.3d at 236 (pointing out that non-medical prison officials are not "chargeable with the Eighth Amendment scienter requirement of deliberate indifference" unless they have a reason to believe (or actual knowledge) that prison doctors or other medical staff are mistreating or not treating a prisoner); Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) (explaining that non-medical prison personnel cannot be considered deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor").

Along with the lack of allegations showing Harry's personal participation, Pugh fails to allege that Harry directed any subordinates at SCI Rockview to violate his rights.  He also fails to

plausibly allege that Harry had "reason to believe (or actual knowledge) that prison doctors or their assistants were mistreating (or not treating) him," see Spruill, 372 F.3d at 236, or that they somehow were failing to protect him from hurting himself.  Overall, Pugh's allegations do not plausibly state a Section 1983 claim against Harry under the second theory for supervisory liability.

Regarding the first theory of supervisory liability, relating to a policy, practice, or custom, the Court construes Pugh's allegations as asserting that Harry either failed to have policies and procedures in place or failed to have adequate policies and procedures in place to help him following the proposed closure announcement.  See (Doc. No. 1 at 12).  The issue with these assertions is that Pugh's averments do not support them.  For instance, Pugh acknowledges that "several hours" after the proposed closure announcement, the SCI Rockview Superintendent delivered a memo to all inmates, including him.  See (id. ¶ 20).  The memo, inter alia, recognized that inmates such as Pugh "may be anxious or concerned," directed such inmates to talk to "Supportive Services staff," and suggested that inmates reach out to Defendants about their concerns with the proposed closure.  See (id. ¶¶ 23, 27).

The following day, Pugh went to visit with the unit teams and psychologists of the Supportive Services staff.  (Id. ¶ 25.)  Pugh spoke with the staff, and his only complaint about their interactions with him is that they essentially did not have information relating to the proposed closure one (1) day after it was announced.  (Id. ¶ 26.)  In other words, despite averring that "Supportive Services were nonexistent," see (id. ¶ 30), Pugh does not actually complain that appropriate mental health services were unavailable to him; instead, he alleges merely that SCI Rockview staff lacked sufficient information to answer his questions about the proposed closure

on the day after it was announced.[11]  At best, not providing SCI Rockview staff with sufficient information would constitute negligence and would not rise to the level of deliberate indifference.[12]  Accordingly, the Court will dismiss Pugh's Section 1983 Eighth Amendment individual-capacity claims against Harry for the failure to state a plausible claim for relief.

### ii.    Claims Against Committee Members

Due to Pugh's inability to identify the members of the Committee, it is unclear from the complaint whether they include supervisory officials.  Nevertheless, the Court's analysis relating to Pugh's claims against Harry apply equally to the Committee members.  In other words, there are no factual allegations in the complaint showing that they were personally involved in violating Pugh's constitutional rights, directed subordinates to violate them, or knew about any violations and acquiesced to them.  In addition, there are no factual allegations establishing a reasonable inference that, with deliberate indifference to the consequences, the Committee

---

[11]  Notably, even though Pugh's averments pertaining to the conduct and experiences of other SCI Rockview inmates are improper, he acknowledges that inmates sought (and seemingly received) "emergency psychiatric treatment," which included increases in their medication.  See (id. ¶ 35).  Pugh also references SCI Rockview's administration issuing suicide pamphlets and showing a video about the "importance of resilience" following incidents of self-harm by other inmates.  See (id. ¶¶ 35, 36).  These actions further demonstrate that medical services were available to the SCI Rockview inmates and that the SCI Rockview administration was actively attempting to help the inmates there.

[12]  There is another flaw with Pugh's claim insofar as it would impose too much of a burden on Harry to have every detail of the proposed closure available to everyone at the time of the proposed announcement and that anything less than that would qualify as a constitutionally deficient policy or procedure.  Pugh's concerns about what might happen to him if SCI Rockview are purely speculative in nature, even if based in part on information purportedly provided to him by SCI Rockview staff.  Stated differently, there are no allegations in the complaint plausibly showing that Pugh would be placed in a section of a different DOC correctional facility with more violent inmates, that the facility in which he would be placed lacked the same programs as SCI Rockview, or that Harry announced or directed her subordinates to tell Pugh that his mental health classification would not be honored at a different facility.

members established and maintained a policy, practice or custom which caused constitutional harm to Pugh.  Accordingly, the Court will dismiss Pugh's Section 1983 Eighth Amendment individual-capacity claims against the Committee members.

### 6.    Pugh's Claims Under the "Federal Disability Statutes"

Pugh asserts official-capacity claims under the "Federal Disability Statutes" against Defendants, which the Court construes as claims under Section 504 of the Rehabilitation Act of 1973 ("RA") and Title II of the Americans with Disabilities Act ("ADA").[13]  See (Doc. No. 1 at 14).  The ADA and RA "establish 'an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities.'"  See Haw. Disability Rts. Ctr. v. Kishimoto, 122 F.4th 353, 361 (9th Cir. 2024) (quoting Updike v. Multnomah County, 870 F.3d 939, 949 (9th Cir. 2017)).  One of the purposes of the RA is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society . . . ."  See 29 U.S.C. § 701(b)(1).  As for the ADA, it "embodies a 'national mandate for the elimination of discrimination against individuals with disabilities[,]' 42 U.S.C. § 12101(b)(1)[, which is] performed across 'three titles of regulation—Title I (employers), Title II (governments), and Title III (public accommodations).'"  See Zangara v. Nat'l Bd. of Med. Examiners, Nos. 24-2664, 24-2672, 2025 WL 1218188, at *4 (3d Cir. Apr. 28, 2025) (unpublished) (quoting Matheis v. CSL Plasma, Inc., 936 F.3d 171, 176 (3d Cir. 2019)).  The Court presumes that Pugh raises a Title II claim insofar as Shapiro and Harry are state employees and the Committee appears to be a state entity.

---

[13]  For purposes of this analysis, the Court presumes that Pugh may assert official-capacity claims under Title II and Section 504 for monetary damages against Defendants.

Title II of the ADA and Section 504 of the RA provide similar protections.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  See 42 U.S.C. § 12132(1).  Section 504 states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance."  See 29 U.S.C. § 794(a).

In addition to providing similar protections, Title II and Section 504 require substantially similar factual allegations to state plausible claims for relief.  Under both statutes, plaintiffs must allege that "(1) they are qualified individuals; (2) with a disability; and (3) they were excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or were subjected to discrimination by any such entity; (4) by reason of their disability." See Durham v. Kelley, 82 F.4th 217, 225 (3d Cir. 2023) (citing Haberle v. Troxell, 885 F.3d 170, 178 (3d Cir. 2018)).[14]  Also, "[w]here compensatory damages are sought, a plaintiff must also show intentional discrimination under a deliberate indifference standard."  See id. (citing Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 289 (3d Cir. 2019)); see also D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 270 (3d Cir. 2014) (requiring plaintiff seeking to establish deliberate indifference to show "(1) [actual] knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that [actual] knowledge" (quoting S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 265 (3d Cir. 2013))).

---

[14] "Refusing to make reasonable accommodations is tantamount to denying access."  Durham, 82 F.4th at 226 (citing Jaros v. Ill. Dep't of Corr., 684 F.3d 667, 672 (7th Cir. 2012)).

"Congress has directed the courts to construe the ADA and the [RA] such that conflicting standards do not arise." New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 300 n.4 (3d Cir. 2007) (citing Bragdon v. Abbott, 524 U.S. 624 (1998)); see also S.H. ex rel. Durrell, 729 F.3d at 260 ("The same standards govern both the RA and the ADA claims."). Nevertheless, "the ADA and the [RA] are not exactly the same." See id. For instance, under Section 504, a plaintiff must also allege that "the program in question received federal dollars." See Durham, 82 F.4th at 225 (citing 29 U.S.C. § 794 and Gibbs v. City of Pittsburgh, 989 F.3d 226, 229 (3d Cir. 2021)); see also Jeremy H. by Hunter v. Mount Lebanon Sch. Dist., 95 F.3d 272, 279 (3d Cir. 1996) (explaining that the ADA "extends the nondiscrimination rule of Section 504 of the [RA] to services provided by any 'public entity' without regard to whether the entity is a recipient of federal funds").

Additionally, the causation elements of Section 504 and Title II differ. See Durham, 82 F.4th at 226. Section 504 requires a plaintiff to establish that "the disability [was] the sole cause of the discriminatory action." See id. (citing CG v. Pa. Dep't of Educ., 734 F.3d 229, 235–36 & n.11 (3d Cir. 2013)); see also 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." (emphasis added)). Thus, "[a]n alternative cause of why a plaintiff was treated differently is fatal to a claim under the [RA] 'because disability would no longer be the sole cause.'" See Lewald v. Pa. Dep't of Corr., No. 22-cv-04625, 2025 WL 1568286, at *3 (E.D. Pa. June 3, 2025) (quoting CG, 734 F.3d at 236 n.11). On the other hand, Title II "only requires but-for causation," see Durham, 82 F.4th at 226 (citing CG, 734

F.3d at 235–36 & n.11), i.e. that the plaintiff establish that the discriminatory action was "by reason of [the plaintiff's] disability." See 42 U.S.C. § 12132.

Based on Pugh's allegations in the complaint, he has failed to allege a plausible Section 504 or Title II official-capacity claim against Defendants.[15]   Regarding both statutes, presuming that Pugh has sufficiently alleged that he is a qualified individual with a disability, he does not allege facts showing how he was excluded from participation in or denied any benefits from the services, programs, or activities of SCI Rockview.  As stated above, Pugh had access to

---

[15] Pugh does not state that he raises these claims against Shapiro or Harry in their individual capacities and, even if he did, his claims would likely also be subject to dismissal.  Pugh cannot seek individual liability against Shapiro and Harry under Section 504.  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 804 (3d Cir. 2007) ("Suits may be brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals." (citing Emerson v. Thiel Coll., 296 F.3d 184, 190 (3d Cir. 2002)); Doe #1 v. Del. Valley Sch. Dist., 572 F. Supp. 3d 38, 78 n.12 (M.D. Pa. 2021) ("Although Plaintiffs' Complaint alleges violations of the ADA and Section 504 against all Defendants, Plaintiffs may only bring such claims against the School District, not the individual Defendants acting in their individual capacity." (citations omitted)).  As for Title II of the ADA, the Court recognizes that the Third Circuit Court of Appeals has not addressed whether Title II allows for individual liability in a published opinion.  See Emerson, 296 F.3d at 189 (3d Cir. 2002) (concluding that individual defendants were not subject to individual liability under Title III of the ADA, and pointing out that "[t]his result comports with decisions of other courts of appeals holding individuals are not liable under "Titles I or II of the ADA, which prohibit discrimination by employers and public entities respectively"); see also Durham, 82 F.4th at 224 n.12 ("This Court has not squarely addressed the question of whether claims may be brought against government officers in their individual capacities under Title II of the ADA." (citation omitted)).  Nevertheless, the Third Circuit has done so in several unpublished opinions.  See, e.g., Kokinda v. Pa. Dep't of Corr., 779 F. App'x 938, 942 (3d Cir. 2019) (unpublished) (concluding that plaintiff's "claims for individual damages liability under Title II of the ADA fail for the simple reason that there is no such liability" (citations omitted)); Bowens v. Wetzel, 674 F. App'x 133, 136 (3d Cir. 2017) (unpublished) (noting that "the District Court could have properly followed the holdings of those circuits which have concluded that there is no individual damages liability under Title II of the ADA, which provides an additional basis to affirm the dismissal of this claim" (citations omitted)); see also Constantine v. N.J. Dep't of Banking & Ins., No. 23-2423, 2024 WL 1988829, at *6 n.9 (3d Cir. May 6, 2024) ("We have apparently not addressed whether the ADA's anti-retaliation provision provides for individual liability.").  District courts within the Third Circuit have reached similar conclusions.  See Snider v. Pa. DOC, 505 F. Supp. 3d 360, 405–06 (M.D. Pa. 2020) ("Individuals are not liable under Title II or the [RA]." (citation omitted)).

"Supportive Services staff," and there is no plausible averment that Defendants, or anyone within the DOC, denied him access to mental health services. His dissatisfaction with the information provided to him about the proposed closure during his consultations with SCI Rockview staff does not equate to him being excluded from or denied services.

Just as importantly, Pugh does not plausibly allege facts creating a reasonable inference that he was excluded from or denied any services solely or in part because of his disability. To the contrary, the complaint contains only conclusory allegations of discrimination and the failure to accommodate, see (Doc. No. 1 at 14), which are insufficient to establish the causation necessary to support that Defendants failed to act solely because of his mental health disability and by reason of this disability. See, e.g., Alvarez v. City of Phila., No. 23-cv-03570, 2023 WL 6520507, at *3 (E.D. Pa. Oct. 4, 2023) (dismissing ADA claim for failure to accommodate where plaintiff alleged only in conclusory fashion that her employer failed to provide reasonable accommodations for her disability); Elbert v. N.Y. State Dep't of Corr. Servs., 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) ("[C]ourts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability."). Further, while Pugh states that he received inadequate medical care from Supportive Services, any inadequate treatment does not create a reasonable inference that he was treated in a particular manner solely based on or because of his mental disability. See, e.g., Iseley v. Beard, 200 F. App'x 137, 142 (3d Cir. 2006) (unpublished) ("Iseley does not claim that he was excluded from any program on the basis of his disability. Rather he claims that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions." (citation omitted)); see also Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (holding that "the [ADA] would not be violated by a prison[] simply failing to attend to the

medical needs of its disabled prisoners").  Accordingly, Pugh has failed to state plausible claims for relief under either Title II of the ADA or Section 504 of the RA against Defendants in their official capacities.[16]

### 7.    Pugh's Civil Rights Conspiracy Claims

Pugh asserts civil rights conspiracy claims pursuant to 42 U.S.C. §§ 1985(3) and 1986 against Defendants.  (Doc. No. 1 at 14.)  Section 1985 permits a plaintiff to assert a civil claim "[i]f two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ."  See 42 U.S.C. § 1985(3).  To state a plausible conspiracy claim under Section 1985(3), a plaintiff must allege facts showing "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."  See Davis v. Wigen, 82 F.4th 204, 214 (3d Cir. 2023) (quoting United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott, 463 U.S. 825, 828–29 (1983)).  A plaintiff must therefore allege that the defendants intended to "deprive [them] of equal protection, or equal privileges and immunities," which "means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.  The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all."  See

---

[16]  Pugh has not alleged that Harry received federal funds in her role as Secretary of the DOC, and this failure also dooms his Section 504 claim against her.

Scott, 463 U.S. at 835 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)). "In most cases, a bare conclusory allegation of 'conspiracy' or 'concerted action' will not suffice." Flanagan v. Shively, 783 F. Supp. 922, 928 (M.D. Pa. 1992), aff'd, 980 F.2d 722 (3d Cir. 1992); see Great W. Mining & Min. Co. v. Fox Rothschild LLP, 615 F.3d 159, 178–79 (3d Cir. 2010) (explaining that conclusory allegations of a conspiracy will not suffice to state a plausible conspiracy claim (citations omitted)). Rather, a plaintiff must plead facts from which the existence of an agreement between defendants can be inferred. See id. ("[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." (citation omitted)).

As for Section 1986, it allows a plaintiff to assert a cause of action for failure to prevent a conspiracy. "[T]o maintain a cause of action under § 1986, the plaintiff[] must show the existence of a § 1985 conspiracy." Clark v. Clabaugh, 20 F.3d 1290, 1295 n.5 (3d Cir. 1994). The plaintiff must allege that:

> (1) the defendant had actual knowledge of a § 1985 conspiracy; (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation; (3) the defendant neglected or refused to prevent a § 1985 conspiracy; and (4) a wrongful act was committed.

See id. at 1295 (citation omitted).

In this case, the Court will dismiss Pugh's Section 1985(3) and 1986 claims for three (3) reasons. First, Pugh may not maintain these conspiracy claims against the Committee because, as explained above, it is not a "person" amenable to suit under Section 1985. See Est. of Lagano v. Bergen County Prosecutor's Off., 769 F.3d 850, 854 n.3 (3d Cir. 2014) (explaining that despite "never [having] explicitly decided whether the term 'person' has the same meaning under §§ 1983 and 1985," noting that "the district courts in our Circuit have consistently" held that the term has the same meaning in both statutes, "see[ing] no reason why" the term should be

interpreted differently, and "assum[ing] that 'person' has the same meaning under both §§ 1983 and 1985"); Rode v. Dellarciprete, 617 F. Supp. 721, 723 (M.D. Pa. 1985) ("[I]t is clear that the Commonwealth and [the Pennsylvania State Police], as an agency of the Commonwealth, are not 'persons' within the meaning of §§ 1983 and 1985."). Second, to the extent Pugh asserts his Section 1985 and 1986 claims for monetary damages against Shapiro and Harry in their official capacities, the Eleventh Amendment bars his claims for the reasons set forth above. See Kokinda, 779 F. App'x at 948 ("The District Court properly concluded that Kokinda's claimed violations of §§ 1983, 1985(3), and 1986 against the DOC and the individual prison staff members sued in their official capacities are barred by the Eleventh Amendment.").

Third, although the Court recognizes that a plaintiff may assert a claim under Section 1985(3) due to discrimination based on mental disability, see Farber v. City of Paterson, 440 F.3d 131, 138 (3d Cir. 2006), Pugh has failed to allege any facts creating a reasonable inference that Defendants conspired to discriminate against him on the basis of his mental disability, much less facts upon which anyone could infer an agreement or understanding among Defendants to deprive him of equal protection of the laws. In this regard, Pugh does not aver facts showing that Defendants' alleged "agreed upon conduct of failing to provide communication, planning, and protective measures for [his] benefit relating to the proposed closure," see (Doc. No. 1 ¶ 95), was based on his mental disability in any way. Instead, Pugh indicates in his complaint that SCI Rockview staff also criticized the proposed closure announcement insofar as they were not given advance notice of the proposed closure. See (Doc. No. 1 at 8–9). Overall, Pugh's conspiracy allegations are the type of conclusory allegations that are insufficient to state a plausible claim for a conspiracy under Section 1985(3). Furthermore, his failure to plead a plausible conspiracy claim under Section 1985(3) is fatal to his Section 1985 claim. Accordingly, the Court will

dismiss Pugh's civil rights conspiracy claims under Sections 1985(3) and 1986 against Defendants.

### 8.    Pugh's Motion to Appoint Counsel

Pugh moves for the appointment of counsel in this matter.  (Doc. No. 6.)  More specifically, he seeks the appointment of class counsel.  (Id.)  The Court will deny this motion.

As a civil litigant, Pugh has no constitutional or statutory right to the appointment of counsel; nevertheless, district courts have broad discretionary power to request appointed counsel for such litigants who cannot afford counsel.  See 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel."); Montgomery v. Pinchak, 294 F.3d 492, 498 (3d Cir. 2002) (citations omitted).  District courts follow a two (2)-step process when deciding whether to request appointed counsel to represent an indigent civil litigant.  See Houser v. Folino, 927 F.3d 693, 697 (3d Cir. 2019).  First, as a threshold inquiry, the court must consider whether the plaintiff's case has some arguable merit in fact and law.  See Montgomery, 294 F.3d at 498–99 (citations omitted). Second, if the court determines that the plaintiff's case has some arguable merit in fact and law, then the court is to consider other factors, including: (1) the plaintiff's ability to present their own case; (2) the complexity of the legal issues; (3) the degree to which factual investigation will be required and the plaintiff's ability to pursue such an investigation; (4) the extent to which the case is likely to turn on credibility determinations; (5) whether expert testimony will be required; and (6) whether the plaintiff can retain and afford counsel.  See Houser, 927 F.3d at 697 (citations omitted).  This list, however, "is not meant to be exhaustive."  See Tabron v. Grace, 6 F.3d 147, 157 (3d Cir. 1993); see also Houser, 927 F.3d at 700 (stating that "[w]e have always emphasized that [these] factors are only a guidepost for district courts in their exercise of the broad statutory discretion

granted to them by Congress[,]" and that "[t]hey are not exhaustive, nor are they each always essential").  Rather, the court must determine on a case-by-case basis whether a request for appointed counsel is warranted.  See Tabron, 6 F.3d at 157–58.

As noted above, the threshold question relating to Pugh's motion for appointment of counsel is whether his claims have "some arguable merit in fact and law."  See Montgomery, 294 F.3d at 498–99.  Pugh does not specifically address this threshold question in his motion.  See (Doc. No. 6 at 1.)  Nonetheless, as indicated above, the Court has determined that Pugh has failed to state a claim that has some arguable merit in fact and law.  Accordingly, the Court will deny Pugh's motion without considering the above-referenced factors.  However, this denial will be without prejudice.  See Tabron, 6 F.3d at 156–57 ("[A]ppointment of counsel under § 1915(d) may be made at any point in the litigation and may be made by the district court sua sponte . . . even if it does not appear until trial (or immediately before trial) that an indigent litigant is not capable of trying his or her case, the district court should consider appointment of counsel at that point.").  If future proceedings demonstrate the need for counsel, the matter of whether counsel should be appointed may be reconsidered either sua sponte or upon Pugh's motion.

## C.    Leave to Amend

Having determined that Pugh's claims against Defendants are subject to dismissal, the Court must determine whether to grant him leave to file an amended complaint.  Courts should generally give leave to amend but may dismiss a complaint with prejudice where leave to amend would be inequitable or futile.  See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007) ("[I]n civil rights cases district courts must offer amendment— irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile."); see also Grayson v. Mayview State Hosp., 293 F.3d

34

103, 108 (3d Cir. 2002) ("When a plaintiff does <u>not</u> seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that [they have] leave to amend within a set period of time, unless amendment would be inequitable or futile.").  "In determining whether [amendment] would be futile, the district court applies the same standard of legal sufficiency as [it] applies under Fed. R. Civ. P. 12(b)(6)."  <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1434 (3d Cir. 1997).

Here, it appears that Pugh will be unable to allege any facts which would allow him to state a plausible claim for relief against Defendants.  Nevertheless, because his Section 1983 Eighth Amendment individual-capacity claims against the Committee members and Harry, his Title II and Section 504 official-capacity claims against Defendants, and his conspiracy claims under Sections 1985(3) and 1986, are subject to dismissal largely because of his insufficient factual allegations, the Court cannot definitively determine that allowing him to amend his complaint would be futile.  As such, the Court will grant him leave to amend his complaint as to only those specific claims.

## IV.    CONCLUSION

For the reasons stated above, the Court will: (1) grant the IFP Application; (2) dismiss the complaint; (3) grant Pugh leave to file an amended complaint as to only (a) his Section 1983 Eighth Amendment individual-capacity claims against the Committee members and Harry, (b) his Title II and Section 504 official-capacity claims against Defendants, and (c) his conspiracy claims under Sections 1985(3) and 1986 against Defendants; and (4) deny his motions for class

certification, for the appointment of class counsel, and for leave to file an amended complaint upon the appointment of class counsel.  An appropriate Order follows.[17]

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[17]  The Order will provide additional information to Pugh about the filing of an amended complaint.